Thomas H. QUINN, Trustee,
vs.
DELFOUR, INC. & others[1]

No. 13056

Superior Court
Commonwealth of Massachusetts

March 26, 1982

Mark M. Curley, counsel for plaintiff.
Martin S. Cosgrove, counsel for defendant.
Terrance J. Hamilton, counsel for counter-claim defendant.
Joseph I. Sussa, counsel for City of Brockton.

## MEMORANDUM OF DECISION
### (Including Findings of Fact
### and
### Conclusions of Law,
### Pursuant to Mass. R. Civ. P. 52[a])

### I.
### PROCEDURAL BACKGROUND
### and HISTORY

This civil action was commenced on March 11, 1976, by the filing of a Complaint. The plaintiff at that time was Roger E. Bombardier, Sr., of Raynham, Massachusetts, doing business under the firm name and style of Middleboro Drywall. Named as defendants were (1) Delfour, Inc. (Delfour), a Massachusetts corporation having an usual place of business in Boston; (2) City of Brockton (City); and (3) Insurance Company of North America (INA).

---

1. City of Brockton and Insurance Company of North America. As described in the Memorandum, New Hampshire Insurance Company was added as a defendant on Delfour's counterclaim.

Delfour counterclaimed (p. #5) on May 12, 1976, seeking to join[2] an additional party, New Hampshire Insurance Company (New Hampshire), as an object of the counterclaim, as surety for Bombardier. The counterclaim sought damages against both Bombardier and New Hampshire.

Discovery, mainly by interrogatories, ensued.

On July 30, 1980, Bombardier suggested (p. #21) that he had filed in bankruptcy, and that Thomas H. Quinn, Jr., had been appointed as his trustee in bankruptcy. On December 30, 1980, the court (Young, J.) allowed Quinn's motion (p. #25) to be substituted as plaintiff.

Further discovery, by interrogatories and production of documents, continued.

Finally, on November 5, 1981, the case was reached for trial, without jury, before the undersigned justice. Numerous witnesses, and a large number of exhibits, were heard and received, respectively.

After the trial was concluded, the parties were given a reasonable time to file requests for findings of fact and conclusions of law, and did so by November 30, 1981.

## II.
## FINDINGS OF FACT
## and
## CONCLUSIONS OF LAW

Based upon all of the credible evidence, including testimony of witnesses, the exhibits, and stipulations of counsel,[3] and the reasonable inferences to be drawn therefrom, giving due effect to the credibility of the witnesses as determined by the court during trial observation, the court makes the following findings of fact, and rules as a matter of law where indicated:

### A. FACTUAL BACKGROUND; EVENTS LEADING TO THE "STOP WORK" ORDER

1. Bombardier is an individual doing business as Middleboro Drywall[4] with an usual place of business in Raynham.

2. Quinn is the trustee in bankruptcy for Bombardier under a proceeding in the U.S. District Court for the District of Rhode Island.

3. Delfour is a Massachusetts corporation with a principal place of business in Boston (Dorchester District).

4. New Hampshire is a foreign corporation with an usual place of business in Cambridge.

5. The City is a duly organized municipal corporation.

6. INA is a foreign corporation with an usual place of business in Boston.

7. On March 12, 1975, the City entered into a contract (general contract) with Delfour for the construction and renovation of a project known as the Three Early Learning Centers at the Goddard, Lincoln and Howard Schools in Brockton (the project). Delfour was to act as the general contractor.

8. On March 24, 1975, Delfour entered into three separate subcontracts with Bombardier d/b/a Middleboro Drywall, a filed subbidder on the project. Middleboro was to provide labor, materials and equipment to perform work necessary in accordance with certain sections of the general contract, as follows:

(a) Section 9A of the specifications to the general contract entitled "plastering" in the amount of $6,610.

(b) Section 9D of the specifications entitled "Acoustical Work" in the amount of $48,357.

(c) Section 9F of the specifications entitled "Drywall" in the amount of $68,890.

---

2. The original papers do not indicate that permission to join New Hampshire as a party was ever granted, judicially. But New Hampshire did answer the counterclaim and has participated fully thereafter.

3. Paragraphs 1 through 6 of this section are drawn from a trial stipulation filed November 12, 1981.

4. For purposes of convenience, the plaintiff is referred to hereafter as "Middleboro."

9. The total cost of the three subcontracts comprehending Sections 9A, 9D, and 9F of the general contract was $123,887. The subcontracts incorporated by reference the general contract, which, in turn, included the specifications, various plans, and AIA Form A 201.

10. Under the terms of the three subcontracts Middleboro agreed, **inter alia,** to be bound to the general contractor, Delfour, by the terms of the plans, specifications, and general conditions, and to assume to the general contractor all the obligations and responsibilities that the general contractor by those documents assumes to the City, except to the extent that provisions contained in them are by their terms or by law applicable only to the general contractor; and to begin, prosecute and complete the work described in the subcontract in an orderly manner and with due consideration to the date or time specified by the awarding authority, the City, for the completion of the entire work, which was October 31, 1975.

11. Delfour required Middleboro to furnish performance and payment bonds for the acoustical and drywall work but not for the plastering work (which was subsequently deleted from the contract). These bonds were furnished and executed by New Hampshire as Middleboro's surety pursuant to G.L.c. 149, § 44H. The general contract specified that Delfour would pay the premium for the subcontract bonds; however, Delfour failed to pay that premium.

12. With respect to the subcontract covering the plastering, Section 9A of the general contract, Middleboro and Delfour agreed that Delfour would provide the labor and material itself and then backcharge Middleboro for those services. Delfour did provide labor and material under that subcontract and billed Middleboro accordingly, commencing May 30, 1975. Since that section was subsequently deleted from their contractual arrangement with the assent of both Delfour and Middleboro, no claim for damages has been made by Delfour in connection with that item.

13. Under the general conditions of the general contract, AIA Form A 201, Delfour as general contractor was required to supervise and direct the work as follows:

4.3 Supervision and Construction Procedure

4.3.1 The contractor shall supervise and direct the work using his best skill and attention. He shall be solely responsible for all construction means, methods, techniques, sequences and procedures and for coordinating all portions of the work under the contract.

14. The specifications stated in part that the general contractor shall provide weather protection and heat during the months of November through March. Weather protection included protection from moisture and necessitated heating to maintain a minimum temperature for methods of construction, and for the curing of materials.

15. The specifications also contained the following requirements: that all surfaces over which a finish material is to be applied shall be cleaned by the contractor and made ready to receive finish material; that all framing shall be well nailed, spiked or bolted together, erected plumb and true in accurate planes and set accurately to support finished work as required by the trade involved; that the various types of construction shall be installed in accordance with the specifications and as described in the manufacturer's printed instructions for the gypsum wall board construction specified; and that the drywall subcontractor install a quality product, and if the specifications, plans or details show any obstacle to producing such a quality finished product, then the drywall subcontractor shall alert the general contractor prior to starting the job, as well as notify the architect in writing.

16. As far as payment to subcontractors was concerned, in order for a sub-

contractor to receive payments the procedure was as follows: the subcontractors, either orally or in writing, would submit a requisition for payment covering materials stored at the job site or for labor performed, or both. At the end of each month a "requisition" meeting took place, attended by representatives of Delfour, the clerk-of-the-works (one Robert Smith) and the architect, Everett Ericson.

17. The clerk-of-the-works was an employee of the City whose duty was to monitor on a daily basis the progress of the project and to record the number of persons present on the job(s), the work performed, any difficulties that arose, and other details and information pertinent to the daily activities of the general contractor, the subcontractors, and the applicable trades when on the job(s). The architect was employed by the City generally to have supervision over the project and to make a final decision as to who should be paid and when. The clerk-of-the-works performed his duties under the direction and control of the architect.

18. Any subcontractor was free to attend the monthly requisition meetings. The architect, having received from Delfour the various amounts sought to be paid upon requisition, toured the three school sites to verify whether the materials claimed to have been supplied had in fact been supplied, and whether the work claimed to have been performed had in fact been accomplished. To the extent that the architect approved payment for the materials and labor claimed, the City would disburse the approved amounts to Delfour. In turn, Delfour was then responsible to pay the subcontractor the amounts approved and certified for such payment by the architect.

19. The specifications required that the general contractor pay the subcontractor within ten days after the general contractor received payment on account of a periodic estimate of the value of the work done, less any amount retained by the City or in consequence of any legal proceedings or statutory liens, and less any amount due the general contractor

from the subcontractor under the subcontract.

20. At the end of May a requisition meeting was held on pay estimate No. 2. At that time the architect approved for payment to Middleboro an amount of $9,671 under the acoustical subcontract, for materials claimed to be stored on the job site, but not actually installed. The architect estimated that by providing these materials, Middleboro had performed 20% of its acoustical subcontract. The architect also approved payment of $8,627 to Middleboro for drywall materials delivered but not as yet installed, representing 12% of the work completed on that subcontract.

21. Middleboro understood that once such materials were delivered to the job site and paid for on requisition, the materials became the responsibility of Delfour to see that they remained on the site, and that the materials likewise became the property of the City, which had now paid for them.

22. Delfour made payments to Middleboro on June 27, 1975, in the form of two checks for $8,357 and $6,500; and an additional check on July 9, 1975, for $2,184. The three payments totaled $17,041.

23. While Middleboro did deliver certain materials to the project in this period before June, it did little or no actual work on the school sites. This was due in part to the fact that demolition had not been completed by Delfour. For all practical purposes, Middleboro did not commence its actual work until August, 1975. In June and July Middleboro stored no materials at any job site; no payment was approved for Middleboro by the architect in those months.

24. Just as Middleboro was slow in getting underway on the project, so, too, Delfour was hardly the model general contractor. From the inception on the work the clerk-of-the-works noted in his running daily reports continuing violations by the general contractor in its prosecution of its tasks, including failure to attend an early job meeting, to supervise the work, to provide an adequate number

of laborers, and to provide any office, phone or toilet facilities. The evidence clearly indicates, and I so find, that almost from the outset Delfour and its subcontractor Middleboro were at loggerheads and continually involved in disputes, many petty and irresponsible.[5] Disputes concerning the drywall and acoustical work, and claimed poor conditions supplied and maintained for the performance of that work, began to be frequent.

25. At the beginning of August representatives of Delfour and Middleboro met. Middleboro understood that there was a completion date set by the City of October 31, 1975, and stated, through Bombardier, that it could complete the project in three months, one month for each school, through providing 28-30 men on a daily basis, which it would commence to do forthwith. At that time the Howard School was ready for commencement of drywall and acoustical work.

26. In this setting, on August 8, 1975, Middleboro asked Delfour for, and was given, an advance of $3,000. Although Middleboro began to perform its work in August and made requisition for a payment which was approved by the architect, the money was not paid to Delfour by the City by September 10, 1975. On that date Bombardier asked Delfour for an advance to pay his men, and was advanced $3,500 by Delfour.

27. At the job requisition meeting at the end of August the architect, after touring the job sites, approved an additional amount to be paid to Middleboro for drywall in the sum of $10,845. This approval was for work installed; at that time the architect estimated that Middleboro had completed 20% of that subcontract. As of September 1, 1975, the architect had approved for Middleboro total payments of $27,343 on the two subcontracts. After receiving the monthly check from the City, Delfour paid Middleboro $3,802.85 on September 25, 1975, bringing total payments to it on that date of $27,343.85.

28. Upon full consideration of all of the often conflicting evidence as to the relations between Delfour and Middleboro from the beginning of August - including the sometimes acrimonious charges and countercharges made as to ultimate responsibility for what seems to be a botched performance of a relatively unsophisticated renovation project - I find that both parties were at fault for what occurred; that each breached duties and obligations toward the other. Subsequent events, which ultimately culminated in a stop order, were the result of their joint breaches and defaults.

## B. MIDDLEBORO'S BREACHES

29. In August, once it began its work Middleboro did not provide the manpower it had agreed to provide. Of the seventeen work days in that month on one day it provided ten men; on another five men; on two days four men; on two days three men; and on eleven days only two men. (It is a fair inference that Middleboro's failure to provide adequate personnel resources was due in part to the necessities of other separate contracts being prosecuted by it simultaneously with the Brockton project.) During August Delfour complained to Middleboro about the latter's not having sufficient workers at the job site; each time Middleboro agreed to provide more. By the end of August Middleboro was behind in the work schedule, having completed only a portion of the Howard School work. Partly responsible, I find, was its failure adequately to staff the project with sufficient workers.

30. The Lincoln school was well behind schedule by September 2, 1975. No walls or rooms had been inspected for sheet rock. There was no stairway as yet

---

5. Observation of the demeanor, and consideration of the testimony, of Bombardier as witness before me leads to the inference that he was a complaining, hyper-technical, difficult person to deal with in this context.

installed at that site. On that same day Middleboro was stopped at the job site by the architect because they were using an unapproved compound rather than "Gold Bond," the approved product. What sheetrock there was that had been installed was subject to the clerk-of-the-works' critical comment: Nails and screws were not set in deep enough or positioned properly.

31. During September Middleboro concentrated its efforts on the Howard School. Still, it failed to provide enough workmen to do the job properly, and it continued to fall further behind schedule due to its failure to adequately man the job sites. I find that during August and September, had Middleboro supplied an adequate and reasonable number of workers to the project to do the subcontract work, much of the difficulty - but not all - could have been avoided. Middleboro's failure to provide an adequate number of workmen constituted a significant and material breach of its duties and responsibilities under the subcontract with Delfour.

32. At the requisition meeting held at the end of September, the architect approved no money for Middleboro as a result of the latter's poor job performance during the month.

33. Middleboro continued to impede the orderly and prompt progress of the work due to its continual lack of manpower. Written complaints on that score were made by Delfour on October 20 and November 3, 7 and 12.

34. On October 8, 1975, Middleboro, without justification or excuse, removed 61 cases of acoustical tiles from the project and converted those tiles to its own use. Despite promising the clerk-of-the-works and Delfour that it would return the material, it brought back only 10 cases. Delfour, being ultimately responsible to provide the tiles, had to pay for the balance of the converted items.

35. For its drywall work performed in October Middleboro received the architect's approval for $4,133. At that time the architect estimated that Middleboro had completed only 34% of the drywall subcontract.

36. In November Middleboro provided manpower at the project on only thirteen days.

### C. DELFOUR'S BREACHES

37. But, as noted above (par. 24), Middleboro was not the only contractual culprit. Delfour must share the blame. On many occasions Middleboro was unable to begin or complete its sheetrock work because the walls had not been inspected by the plumbing and wire inspectors. I also find that, on some occasions, Delfour ordered Middleboro to install drywall under conditions, and in a fashion, which were in violation of contractual and manufacturing specifications, and not in accordance with proper and good practices. I also find that Delfour failed to install underlying strapping and studs (which failure was a contributing factor in Middleboro's inability to perform), and failed to coordinate and supervise the work of the subtrades, particularly plumbing and electrical, so that Middleboro could perform its drywalling work. The failure to coordinate and supervise also was a contributing factor, which, joined with Middleboro's failure adequately to man the project, resulted in the unfortunate job failure.

38. Delfour's chief contribution to the difficulties which occurred, however, was its continued - and often stubborn -refusal to live up to its clear contractual obligation to provide reasonable, proper and appropriate "weather protection" so that Middleboro could properly perform its own duties.

39. As noted, the specifications required the contractor to provide weather protection, as follows:

"(3) Weather Protection
***

(c) "Weather Protection" shall mean the temporary protection of that work adversely affected by moisture, wind and cold by covering, enclosing and/or heating. This protection shall provide adequate working areas

during the months of November through March as determined by the owner and consistent with the approved construction schedule to permit the continuous progress of all work necessary to maintain an orderly and efficient sequence of construction operations. The general contractor shall furnish and install all "weather protection" material and be responsible for all costs, including heating required to maintain a minimum temperature of 40° F. at the working surface. This provision does not supersede any specific requests for methods of construction and/or curing of materials."

40. Among the specific requirements for methods of construction and/or curing of materials were the specifications from the sheetrock manufacturer, United States Gypsum. These specifications which Middleboro brought to the attention of Delfour, the City, the clerk-of-the-works and the architect required, in part:

"...proper heat and adequate air circulation. A minimum temperature of 55° F. should be maintained day and night all through the erection of the gypsum wall board, taping, finishing and until final decoration is thoroughly dry***Improper heat or inadequate air circulation causes uneven drying, leading to bonding failure, delayed shrinkage and paint discoloration."

41. I am persuaded by the evidence, and I find, that on many occasions the conditions at the project were too damp and too cool[6] to carry on the taping of the sheetrock. Several times conditions damaged the sheetrock work already completed. Heat was not provided in accordance with the contract specifications during the months of November and December, 1975. Failure to provide heat to counteract damages, with temperatures below 55° F., caused damages to acoustical ceiling tile, drywall, joint compound, and tape, both in storage and when installed. These problems of insufficient heat and dampness were noted by the clerk-of-the-works as early as September and continued through November. At all three schools in November the temperature for a significant part of the time was below the minimum 55° F. constant temperature required by U.S. Gypsum. The damage thus caused to drywall material was a significant and substantial factor in preventing Middleboro from performing its contractual obligations.

### D. THE "STOP WORK" ORDER

42. The City, on November 17, 1975, issued a "stop work" order, as a result of Delfour's failure to comply with the heating specifications.

43. On November 21, 1975, Middleboro made a demand for direct payment pursuant to G.L.c. 30, § 39F.

44. On November 25, 1975, the architect wrote to the City's Superintendent of Buildings, advising him that sufficient cause existed to start termination proceedings regarding the City's general contract with Delfour. By letter dated the same day, the City terminated the general contract between itself and Delfour.

45. Also on November 25, 1975, Delfour sent a letter to Middleboro terminating it for breach of contract.

46. On December 1, 1975, Delfour commenced a civil action entitled **Delfour, Inc. v. City of Brockton,** C.A. No. 10843, Suffolk, seeking to enjoin the termination. On that date Delfour obtained a temporary restraining order and an order of notice for a hearing on a preliminary injunction to be held on December 10, 1975. On that latter date, a justice of the Superior Court dissolved the temporary restraining order.[7]

---

6. For example, 38° F. on November 12, 1975.

7. Apparently the contesting parties reached an accord which obviated the necessity for injunctive relief.

47. Thereafter, on December 18, 1975, the City and Delfour entered into a new agreement (entitled Memorandum of Agreement) in which they expressly acknowledged that the general contract had been terminated and that Delfour had been removed from the job site. The Memorandum of Agreement referred to the notice of termination by the City to Delfour on November 25, 1975.

48. Thereafter Delfour completed the work on the three schools. No heat was supplied by it to the three buildings until late January or February. The drywall work was not completed[8] until sometime in April, 1976.

### E. NEITHER DELFOUR NOR MIDDLEBORO SHOULD RECOVER

49. In sum, I find that both Delfour, the general contractor, and Middleboro, the subcontractor, were guilty of serious significant, substantial and material breaches of the subcontract into which they entered. I find and rule that neither is entitled to recover any damages from the other. Substantial and appropriate justice will be done in this situation if the law leaves the parties as it finds them. The conjunction of their respective conduct in carrying out their duties and responsibilities under the subcontract has really resulted in damage to one party only: the City, which received a shoddy and tardy performance of the general contract.

### F. THE CLAIM AGAINST NEW HAMPSHIRE

50. Inasmuch as Middleboro is not liable here to respond in damages to Delfour on the latter's counterclaim, Middleboro's surety, New Hampshire, is not liable.

### G. THE CLAIM AGAINST THE CITY

As stated by the court, during the hearing, no claim whatsoever has been made out against the City in this case. Any claim against it is to be dismissed, with prejudice, and with costs.

### III.
### CONCLUSION

A final judgement is to enter, dismissing all claims of the plaintiff, and all counterclaims, with prejudice. Costs only to the City of Brockton.

**So ordered**

**James P. Lynch, Jr.**
**Justice of the Superior Court**

---

8. Another subcontractor was employed to finish it.